393 P.2d 144

**RENTAL DEVELOPMENT CORPORATION OF AMERICA, a corporation, Appellant,**

**v.**

**RUBENSTEIN CONSTRUCTION COMPANY, a corporation, and Fireman's Fund Indemnity Company, a corporation, Appellees.**

No. 7070.

Supreme Court of Arizona,

In Division.

June 11, 1964.

James T. Bialac, Lewis, Roca, Scoville, Beauchamp & Linton, Phoenix, for appellant.

James E. Flynn, Phoenix, for appellees.

LOCKWOOD, Vice Chief Justice.

The Rental Development Corporation of America, hereafter referred to as Rental Development, owns the Park Lee Alice Apartments. Rental Development sued the builder of the apartments, the Rubenstein Construction Company, hereafter referred to as Rubenstein, for $210,000 damages for latent defects discovered within one year after the acceptance of the apartments. The trial court held for Rubenstein and this appeal resulted.

The facts are as follows: Rubenstein contracted with Rental Development to construct an apartment project for approximately $4,000,000. The Irving Trust Company financed the project and took a mortgage in return. Irving Trust would advance money periodically to Rental Development. This money was then turned over to Rubenstein. Repayment of this mortgage was insured by the Federal Housing Administration. Consequently, F.H.A. maintained its own building inspectors on the project.

The construction contract between Rental Development and Rubenstein contained the following condition:

"6. The Contractor shall acceptably correct any defects due to faulty materials or workmanship which appear within a period of one year following substantial completion. The date of substantial completion is the date when the project has been acceptably completed in accordance with the drawings and specifications, when the entire project has been accepted for occupancy by the local authorities having jurisdiction and by the Lender and the F.H.A., and when the mortgage has been finally endorsed for insurance."

This portion of the construction contract was a standard F.H.A. form.

In February of 1956, the construction of the project was almost completed. The contract provided that Rubenstein could not get its last cash advancement from Irving Trust until the project was completed and accepted. At a meeting on February 8, 1956, to close this phase of the operation, Rental Development was asked to sign a letter, hereafter referred to as Exhibit 9. This was a statement accepting the project, releasing Rubenstein "from any claim or responsibility of every kind, character, nature and description" and providing that "full responsibility for the construction of the said project is, from the date of this correspondence, the sole responsibility" of Rental Development. When Rental Development refused to sign such a release, another letter was prepared. This letter, hereafter referred to as Exhibit 8, reads as follows:

"Phoenix, Arizona
February 8, 1956

Rubenstein Construction Company
Phoenix, Arizona

Gentlemen:                    RE    Park Lee Alice
                                    Project No. 123–00012
                                    Rental Development Corp.
                                        of America

This will acknowledge that the above captioned project has been fully completed by the Rubenstein Construction Company, the general contractor, on the 18th day of November, 1955, in accordance with the plans and specifications, approved by and filed with the Federal Housing Administration, and this will further acknowledge that the Rental Development Corporation of America accepts above captioned project as completed.

The undersigned herewith agrees that it will not make further demands upon the contractor by reason of the construction of the project except through the Federal Housing Administration.

Yours very truly
Rental Development Corporation of America
By JOS. F. WALTON"

---

This letter was signed by Joseph F. Walton, the corporate secretary of Rental Development.

Nine months later, F.H.A. inspected the apartment project for defects and, on November 13, 1956, sent the inspection report listing numerous defects to Rubenstein. On November 15, 1956, Rubenstein wrote one of its subcontractors to take care of the roofing defects indicated on the F.H.A. report. Then on November 19, 1956, in reply to the inspection report, Hyman Rubenstein, the corporate president of Rubenstein, wrote to F.H.A. a letter which stated, in part:

"I have gone over the inspection report very carefully for the purpose of ascertaining whether or not the inspection report contained any latent defects in order to determine where any corrective action on the part of Rubenstein Construction Company was indicated in the premises.

"After a complete and thorough analysis of the inspection report, I have concluded that there are two items in the report which by a rather broad construction of the term 'latent defect' may be considered to fall in that cate-

gory. Those are the repairs necessary to the roof and such corrective action as may be necessary by reason of the peeling of the paint as indicated in the report."

But as to the other items listed in the inspection report, Rubenstein advised F.H.A. that "said items do not constitute latent defects" and informed F.H.A. that Rubenstein would "take no corrective action whatsoever in connection therewith."

F.H.A. demanded that Rental Development take all possible remedial action against Rubenstein. F.H.A. is a preferred stockholder of Rental Development and could take over its management. This action resulted. At the trial below, Rubenstein offered Exhibit 8 as a release of all future claims for latent defects. The trial judge held this was a valid defense to Rental Development's complaint and, therefore, granted judgment for Rubenstein. Rental Development appealed.

The key issue in this case involved Exhibit 8 which is set forth above. Did this letter manifest an intention to release Rubenstein from the obligation imposed by the construction contract to correct latent defects discovered within one year following substantial completion of the project? In response to this question, two conflicting constructions of Exhibit 8 are offered this Court by the parties. Rubenstein contends Exhibit 8 constitutes an unambiguous release. Rental Development on the other hand, contends that the language "fully completed * * * in accordance with the plans and specifications" does not indicate an intention to release, especially when interpreted in the context of the entire transaction.

The rule is well established that a court, when construing an agreement, must put itself in the position of the parties and give effect to their intention as of the time the agreement was made. Ashton v. Ashton, 89 Ariz. 148, 359 P.2d 400 (1961). Where two parties have made a written agreement to which they have both assented as the complete and accurate integration of that contract, evidence of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing. Guerin v. Higgins, 70 Ariz. 219, 218 P.2d 870 (1950); Corbin, Contracts § 573 (1960). This is what has been called the "parol evidence rule," a rule that causes much confusion because it has been called a rule of evidence. As Corbin points out, however, this is a rule of substantive contract law, rather than a rule of evidence:

"The use of such a name for this rule has had unfortunate consequences, principally by distracting the attention from the real issues that are involved. These issues may be any one or more of the following: (1) Have the parties

made a contract? (2) Is that contract void or voidable because of illegality, fraud, mistake, or any other reason? (3) Did the parties assent to a particular writing as the complete and accurate 'integration' of that contract?

"In determining these issues, or any one of them, there is no 'parol evidence rule' to be applied. On these issues, no relevant evidence, whether parol or otherwise is excluded. No written document is sufficient, standing alone, to determine any one of them, however long and detailed it may be, however formal, and however many may be the seals and signatures and assertions. No one of these issues can be determined by mere inspection of the written document.

"In determining these issues, however, there is no necessity for being guillible or simple minded. The party presenting the writing will testify to its execution and to its accuracy and completeness. The form and substance of the document may strongly corroborate his testimony; or it may not. There may be disinterested witnesses who corroborate him; or who contradict him. There may be corroboration in other circumstances that are proved; or there may not. When the other party testifies to the contrary on any of these issues, he should always be listened to; but he does not have to be believed. His testimony may be so overwhelmed that it would be credited by no reasonable man; or it may not. Perhaps a verdict should be directed; but perhaps not. This is a question of weight of evidence, not of admissibility." Contracts § 573.

For similar views, see also McCormick, Evidence 441 (1954); Wigmore, Evidence § 2430 (3rd ed. 1940); Restatement, Contracts § 240.

In the instant case, however, the trial judge, appears to have regarded the "parol evidence rule" as a rule of evidence. The trial judge repeatedly cut off testimony concerning the circumstances surrounding Exhibit 8. For example, the following incident took place at the trial:

"Q. Referring again to Defendant's 8, there appears a paragraph, 'The undersigned herewith agrees that it will not make further demands upon the contract or by reason of the construction of the project except through the Federal Housing Administration.' Did you have a conversation or at your meeting was this matter referred to?

"A. Yes.

"MR. FLYNN: Just answer 'Yes' or 'No.'

"Q. BY MR. ELSING: Was anything said in regard to what was meant by the word 'demand'?

"A. Yes.

"Q. Will you relate what that was?

"MR. FLYNN: That is objected to, it is another attempt to vary the terms of the written instrument by parol evidence.

THE COURT: Objection sustained."

Although the trial judge properly admitted all the offered documentary evidence relevant to the purpose of Exhibit 8, he consistently refused to allow oral testimony of the surrounding circumstances.

The trial judge concluded that the language of Exhibit 8 constituted an unambiguous release of liability for all future defects, latent or otherwise. But when Exhibit 8 is read in the light of the F.H.A. inspection requirement in the original construction contract, it is evident that Exhibit 8 was not intended as such a release. At the time it was signed, Exhibit 8 had two purposes: first, it enabled Rubenstein to obtain the last cash advancement from Irving Trust; and, second, it enabled Rent-al Development to take possession of the project from Rubenstein. Rental Development, before signing Exhibit 8, had refused to sign Exhibit 9 which was an express release. Moreover, F.H.A. did not consider Exhibit 8 a release because F.H.A. inspected the project in accordance with the terms of the original construction contract. The letters written by Rubenstein to the subcontractor and to F.H.A. further support the position that Exhibit 8 was not intended as a release.

■ Examining the record, we find no evidence to support the trial judge's finding that Exhibit 8 constituted an unambiguous release. To the contrary, "fully completed * * * in accordance with the plans and specifications" may mean that the owner does not waive any defects, latent or otherwise, where the defects occur because of a failure to live up to the specifications.

For the foregoing reasons, the judgment is reversed and the case is remanded for a new trial in accordance with the views herein expressed.

UDALL, C. J., and STRUCKMEYER, J., concur.